## INTERNATIONAL & G. N. RY. CO. v. ISAACS. (No. 1329.)

(Court of Civil Appeals of Texas. Texarkana. May 7, 1914.)

1. APPEAL AND ERROR (§ 1064*)—HARMLESS ERROR—INSTRUCTIONS.

To instruct, in a railroad crossing accident case, that it was defendant's duty to blow the whistle "within" 80 rods of the crossing, instead of at least 80 rods from it, was harmless; it being hardly probable under the evidence that the jury could have concluded from the evidence that the whistle was blown at least 80 rods from the crossing and not within that distance, and the evidence showing without dispute that the train was running in excess of the speed limited by ordinance, also charged as negligence.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4219, 4221–4224; Dec. Dig. § 1064.*]

2. NEGLIGENCE (§ 72*)—CONTRIBUTORY NEGLIGENCE — PERILOUS SITUATION — SUDDEN IMPULSE.

Contributory negligence, as generally understood, has no application as a defense where the injured party is placed in a perilous situation by negligence of the wrongdoer, and acts on a sudden impulse. Under such conditions, one is not expected to exercise that degree of deliberation and prudence demanded at a time when no danger exists.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 99, 100; Dec. Dig. § 72.*]

3. RAILROADS (§ 348*)—CROSSING ACCIDENT—CONTRIBUTORY NEGLIGENCE—PERILOUS SITUATION—SUDDEN IMPULSE—EVIDENCE.

Evidence, in a railroad crossing accident case, where the person injured attempted to cross in front of the train, after he, when 20 or 25 feet from the track, had seen the train, held to support a verdict for plaintiff on the theory of exoneration from contributory negligence by reason of his having acted on sudden impulse, when in a perilous situation, in which he had been placed by defendant's negligence.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1138–1150; Dec. Dig. § 348.*]

Appeal from District Court, Tarrant County; R. H. Buck, Judge.

Action by J. L. Isaacs against the International & Great Northern Railway Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Thompson & Barwise, of Ft. Worth, for appellant. Alexander, Power & Ridgway, of Ft. Worth, for appellee.

HODGES, J. On March 19, 1913, the plaintiff below, appellee here, was injured by one of the appellant's locomotives while crossing its track on one of the public streets in the city of Ft. Worth. He brought this suit and recovered damages against the appellant in the sum of $1,000. According to his testimony, he was traveling east on Llano street, one of the public highways of the city, approaching the appellant's track and intending to cross it. When within about 150 feet of the track, the horse he was driving became frightened at a lady who was sprinkling a lawn near the street, and began to run, but was subsequently put under con-

trol before reaching appellant's track. When about 20 or 25 feet from the track, and after looking in both directions, the appellee says, he discovered appellant's train approaching the crossing. He testifies as follows as to what he then did:

"I glanced for a train, and then went on. and as I got in 20 or 25 feet of the railroad, I looked again for a train. The first time I looked, I did not see the train, and the second time I saw it. Just the top of the train is all I could see, the smokestack and top of the boiler; and I was scared, and I thought about getting away from there, that I had to get away from there, and I looked to my right, and there was a ditch, and I was afraid to try to turn. The wagon is not an undercut wagon, it is a high-wheel wagon, and I thought I had time to get across the crossing, and I tried to, and pushed my horse up to get away from it, and the train struck the back end of my wagon and knocked the wagon about 20 feet."

Again he says:

"My first thought was to get away from it—to turn back, and I say I didn't think I could make it by turning away from it, on account of the ditch and the post and from the wagon being a high-wheeled wagon and not an undercut. I was afraid it would turn over and probably throw me under the train, and it struck me the best chance I had was to get across and get away from it. * * * I saw I could not turn without probably turning the wagon over and throwing me under the train and I thought I could make it across."

He further testified that when he discovered the train it was 50 or 60 yards from the crossing; that he then had his horse under control and could have stopped him, but he did not try.

[1] The court gave the following as a part of his general charge:

"You are instructed that it was the duty of the trainmen in charge of said train to whistle within 80 rods of the crossing on Llano street, and to keep the bell ringing continuously thereafter until after the crossing had been passed during all the time within the city limits while the train was moving, and a failure to do this would be negligence."

It is contended that this charge does not state the statutory requirements; that in effect it tells the jury that it was the duty of the appellant's employés in charge of the train to blow the whistle after passing the point 80 rods distant from this crossing. Saying that the whistle must be sounded within 80 rods of the crossing, when literally construed, means that it be sounded at or after passing a point 80 rods distant from the crossing. But did this charge probably mislead the jury and cause the rendition of an improper judgment? The only evidence that the whistle was not sounded as required by law was the testimony of the appellee, and one or two others, that they did not hear it. Mrs. Carpenter, a witness for the appellant, testified that the only whistle she heard was that sounded when the train was near Canadian street crossing, less than 80 rods from the Llano street crossing, where the accident occurred. It is hardly probable that the jury would have concluded from this evidence that the whistle had been blown at least 80 rods

distant from Llano street and had not been blown within that distance. The evidence that the speed at which the train was running was in excess of six miles an hour, the limit fixed by the city ordinance, being undisputed, the jury must have placed their finding as to negligence upon that ground, and not upon the failure to blow the whistle within the 80 rods.

[2] The court gave the following special charge at the instance of the plaintiff:

"If you believe from a preponderance of the evidence in this case that defendant's employés in charge of the train which struck plaintiff's wagon failed to give the signals required by law, for the street crossing, or if you believe that said train was moving at a greater rate of speed than six miles an hour in approaching said street crossing, and that said street crossing, was within the corporate limits of the city of Ft. Worth, and if you further believe that by reason of such failure to give signals, if there was such failure, or by reason of such excessive rate of speed, if any, that plaintiff was placed thereby in a situation of real or apparent danger and was so alarmed and frightened that it appeared to him that he was in danger of the loss of his life or serious injury to his person, and you believe that plaintiff in an effort to save his life or to save himself from serious bodily injury continued across said track while so frightened, and you believe plaintiff was injured by his wagon being struck by said engine, then you are instructed that plaintiff would not be guilty of contributory negligence and would be entitled to recover such damages as you may believe from the evidence he is entitled to, even though you may believe that if he had acted differently he would have escaped injury."

It is contended that this charge was vague and obscure and exonerated the plaintiff from contributory negligence, regardless of whether or not he acted as a person of ordinary prudence would have acted under the circumstances. Appellee further testified as follows:

"From the time my horse got frightened, up to the time that I saw the train, he was not running very fast, and I had been trying to stop him and had him about under control when I saw the train, but I don't know that I could have stopped him, for I did not try. I think I had him under control by the time I saw the train, and, when I saw the train, I thought about turning away from the train and getting away from it, because I knew that the horse had been excited, and I knew in my own mind that he would not stand there while that train passed. If I had gotten out of the wagon and had let the horse go, the chances are I would have stumbled and fell, and the horse might have knocked me under the train. I thought about all that—I thought several thoughts. I did not think that the chances were the train would hit me and throw me up to the sky, but I thought I had plenty of time to make it across, and that is the reason I slapped my horse up to try. I saw I could not turn without probably turning the wagon over and throwing me under the train, and I thought I could make it across."

Contributory negligence, as it is generally understood, has no application as a defense where the injured party is placed in a perilous situation by the negligence of the wrongdoer and acts upon a sudden impulse. Under such conditions, people are not expected to exercise that degree of deliberation and prudence which is demanded at a time when no danger exists. Ry. Co. v. Neff, 87 Tex. 308, 28 S. W. 283.

At the instance of the appellant, the court gave the following special charge:

"If you find and believe from the evidence that at the time the plaintiff first saw the approaching train he was far enough from the track and had his horse under control so that he could have stopped same and avoided a collision, and if you further find and believe that a reasonably prudent man under those circumstances would not have attempted to cross the track in front of such approaching train, then you will find for the defendant, even though you may believe that the employés of defendant were guilty of all of the acts of negligence charged against them."

[3] There was ample evidence to support the verdict rendered, and the judgment is affirmed.